**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **JOHN DOE** ) | |
| ) | **Civil Action No.** |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **THE UNIVERSITY OF CONNECTICUT,** ) | **COMPLAINT & DEMAND** |
| **CAMERON LISTON, KIMBERLY** ) | **FOR JURY TRIAL** |
| **BEARDSLEY-CARR, JOSEPH REVANDER,** ) | |
| **JENNIFER NAPIORSKI, AND DAVID** ) | |
| **CLOKEY** ) | |
| ) | |
| **Defendants** ) | |

## COMPLAINT

## INTRODUCTION

1.      John Doe ("**Doe**" or "**Plaintiff**") sues Defendant the University of Connecticut ("**UCONN**" or "**Defendant**") and various employees of UCONN for violation of 20 U.S.C. 1681, et seq. ("**Title IX**") and due process violations.

2.      John Doe has had his college career and professional aspirations destroyed because UCONN refused to make an unbiased and rational decision regarding false sexual assault allegations against Doe, despite overwhelming evidence which demonstrated the falsity of the allegations against him.

3.      John Doe was set to begin the fall semester of his junior year at UCONN where he has been an excellent student, as he has been his entire life. John Doe aspires to study law and become an attorney, but the events of this case have put those aspirations in serious jeopardy.

1

4.      In August of 2023, after a hearing held by UCONN under it's Title IX rules and procedures, a two-person hearing panel (the "**Panel Members**") found that John Doe had committed a sexual assault upon a fellow female student, referred to herein as "**Jane Roe**," and suspended John Doe for one (1) academic year.

5.      However, that decision came after months of a biased application of UCONN's Title IX rules and procedures consistently in favor of the female complainant to the detriment of John Doe, and only after the Panel Members did everything they could, including at some points making up evidence that did not exist, to get around the overwhelming evidence which compelled a decision in John Doe's favor.

6.      To that end, the logical, fair, and correct conclusion based upon the actual evidence could have hardly been clearer. The complainant, Jane Roe, alleged an incredible story which involved John Doe drugging her at a bar, bringing her back to his dorm room against her will, penetrating her while she was sleeping, violently holding her down by her neck as she screamed "no" and "stop", and then stuffing his fingers down her throat as she struggled for minutes to get him off, all before running out of Doe's dorm room and calling her ex-boyfriend to come get her.

7.      However, Roe's friend – who John Doe had only met a few weeks prior – was at the bar with Roe and Doe (hereinafter "**Roe's Friend**"). Roe's Friend was also in the Uber during the ride back to the dorm, and she was in the room laying only feet away when the assault allegedly occurred.

8.      Roe's Friend did not see any drugging at the bar; instead she saw Jane Roe enjoying the company of John Doe, and remarked that "everyone was having fun." Roe's Friend did not see anyone being forced to go home with John Doe; instead, Roe's Friend

joined Jane Roe and John Doe in the Uber ride, recalling that Jane Roe was "laughing" and "energetic." When at the dorm, Roe's Friend remembers leaving the room, as she saw John Doe and Jane Roe begin to make out. When Roe's Friend returned to the room about 20 minutes later, Doe, Roe, and Roe's Friend "were just laughing and making jokes." As Roe's Friend laid down on the lofted bed belonging to Doe's roommate, John Doe and Jane Roe were cuddled just feet away on a futon watching a movie. And when Jane Roe eventually grabbed her phone and left John Doe's dorm room, Roe's Friend did not hear anything resembling a violent struggle or forcible intercourse. Instead, as she heard the door shut, Roe's Friend turned and saw John Doe fully clothed looking completely normal.

9.      In the end, Roe's Friend was not the only person who saw John Doe and Jane Roe together that night. Indeed, surveillance footage showed Jane Roe happily running into John Doe's dorm upon returning from the bar. In addition, many people were with John Doe and Jane Roe throughout the night. Some of John Doe's friends even walked into his dorm room while the couple was together. Nobody saw or heard a struggle, or any sign of distress or displeasure, let alone a violent rape.  In fact, no evidence – objective or otherwise – corroborated Jane Roe's story: no witnesses, no medical evidence of date-rape drugs, and no bruises or marks consistent with the violence she described.

10.      After an investigation which spanned approximately six months – in large part because of UCONN's continued willingness to entertain Jane Roe's ever-changing and evolving allegations – the Title IX investigator left four clear questions of fact for the the Panel Members to decide after a hearing: (i) "Whether [John Doe] 'roofied' or

'drugged' [Jane Roe] during the late hours of November 17, 2022, and early hours of November 18, 2022"; (ii) "Whether [John Doe] inserted his penis into [Jane Roe]'s vagina during the early morning hours of November 18, 2022, while [Jane Roe] was asleep or incapacitated"; (iii) "Whether [John Doe] engaged in sexual activity with [Jane Roe] after [Jane Roe] stated, 'No' and 'Stop'"; and (iv) Whether [John Doe] forced [Jane Roe] to continue in sexual activity by inserting his fingers inside [Jane Roe]'s mouth and down [Jane Roe]'s throat to 'muffle [Jane Roe's] screaming.'"

11.     Those questions of fact were not an accident; they were based explicitly upon what Jane Roe had alleged. And had UCONN's Panel Members actually tried to answer those questions, using only the evidence supplied by parties and gathered by the investigator, the answers would have been "NO" to each question.

12.     However, clearly not satisfied by an outcome that would have rejected the female-complainant's story, the Panel Members chose not to answer any of the four questions of fact that were noticed. Instead, they created their own standards, created new allegations never made by Jane Roe, and created new evidence that did not exist, all of which resulted in a decision that recounted a made-up scenario where a sexual assault could have happened – although not the one alleged by Jane Roe or supported by the actual evidence.

13.     In the end, the Panel Member's arbitrary and irrational decision was not the exception in UCONN's biased application of the Title IX rules and procedures. Rather, it was the culmination of repeated biased and unfair decisions to the detriment of John Doe, which included, but was not limited to:

    a.  excluding relevant evidence favorable to John Doe;

4

b. making unilateral decisions to initiate formal complaints and investigations against John Doe based upon completely new allegations made by Jane Roe in the course of interviews during the Title IX investigation, but not doing the same when John Doe alleged acts by Jane Roe which would have been a violation of Title IX and the student code of conduct;

c. refusing to afford John Doe a reasonable postponement to address new claims and evidence put forward by Jane Roe, while at the same time, continually allowing delays by Jane Roe;

d. allowing Jane Roe's advisor to participate in the Title IX hearing without Jane Roe present;

e. allowing Jane Roe's advisor to abuse the hearing process and waste time;

f. ignoring John Doe's unrebutted expert witness evidence;

g. creating an evidentiary label for one of Jane Roe's witnesses which was ostensibly favorable to female complainants, without there being any information in UCONN's Title IX rules which provided notice of the potential use of such labels or terms of art;

h. misapplying the "preponderance of the evidence standard;"

i. misstating evidence and creating new evidence without any supporting factual basis; and

j. refusing to disclose any information about the background of the Panel Members prior to the hearing to ascertain whether they had any inherent biases in favor of a female complainant, and against a male respondent.

14. Upon information and belief, the repeated biased decision-making and application of Title IX rules against the male John Doe was not an isolated event, but rather, was the result of systemic gender bias by UCONN in its application of Title IX rules and procedures.

15. Despite John Doe having timely filed an appeal within UCONN's Title IX rules, the appeal officer upheld the decision, giving scant justification for UCONN's egregious improprieties.

16.     Having no other recourse, John Doe brings this complaint to undo the devastation to his future that UCONN has created and refuses to rectify.

## PARTIES

17.     Plaintiff John Doe is a 20-year old male who, prior to the disciplinary action taken by UCONN, had just begun his junior year at UCONN. At all relevant times, Doe resided in Storrs, Connecticut.

18.     Non-party Jane Roe is a female who at all relevant times was a student enrolled in UCONN's undergraduate program, and was the Complainant in the Title IX proceedings at issue in this Action.

19.     Defendant UCONN is a public research university and institution of higher learning with its principal place of business at 233 Glenbrook Road, Storrs, CT 06269.

20.     At all times relevant to this Action, Defendant Cameron Liston ("**Title IX Coordinator Liston**") was UCONN's Title IX Coordinator. In that role, upon information and belief, Title IX Coordinator Liston is responsible for ensuring the proper application of Title IX policies governing investigations and hearings for Title IX disciplinary cases. Upon information and belief, Title IX Coordinator Liston is responsible for, and has the authority to, invalidate any Title IX hearing outcomes which violate any student's rights under Title IX, the Constitution, or UCONN's policies.

21.     At all times relevant to this Action, Defendant Kimberly Beardsley-Carr ("**Community Standards Director Carr**") was the Director of UCONN's Office of Community Standards. Upon information and belief, Community Standards Director Carr has the authority to expunge, erase, modify, and/or remove records of disciplinary actions

which were imposed in a manner which violate any student's rights under Title IX, the Constitution, or UCONN's policies.

22.    Defendant Joseph Revander is a Student Welfare Specialist at UCONN ("**Panel Member Revander**"). Pertaining to this Action, Mr. Revander was one of the Panel Members which rendered the erroneous decision against John Doe.

23.    Defendant Jennifer Napiorski is a Student Welfare Specialist at UCONN ("**Panel Member Napiorski**"). Pertaining to this Action, Ms. Napiorski was one of the Panel Members which rendered the erroneous decision against John Doe.

24.    Defendant David Clokey ("**Appeal Officer Clokey**") is the Assistant Vice President for Student Life & Enrollment at UCONN. Pertaining to this Action, Appeal Officer Clokey conducted John Doe's appeal of the Panel Members' decision and authored the erroneous appeal decision which wrongfully upheld the Panel Members' decision.

25.    As set forth more fully below, the Causes of Action pertaining to Title IX Coordinator Liston and Community Standards Director Carr are brought against them in their *official* capacities only.

26.    As set forth more fully below, the Causes of Action pertaining to Panel Member Revander, Panel Member Napiorski, and Appeal Officer Clokey are brought against them in their *personal* capacities only.

## JURISDICTION AND VENUE

27.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's cause of action arises under Title IX, 20 U.S.C.1681, et seq. and the United States Constitution.

28.     This Court has personal jurisdiction over all parties in this lawsuit because each party resided, at all times relevant to this lawsuit, in Connecticut.

29.     Venue is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred at UCONN's campus within the jurisdiction of this Court.

## FACTUAL BACKGROUND

### Background of John Doe and Jane Roe's Relationship

30.     On or around November 5, 2022, John Doe met Jane Roe at a party at John Doe's fraternity house. Jane Roe attended the party with Roe's Friend, who John Doe also met for the first time that night. That night, John Doe and Jane Roe immediately connected. By the end of the night, Jane Roe willingly went back to John Doe's dorm where they had consensual sex two times over the span of a few hours. Jane Roe also spent the night where she slept together with John Doe.

31.     After that night, John Doe and Jane Roe began hanging out and talking regularly, including repeated flirtatious communications consistent with a budding romantic relationship. They primarily communicated over Snapchat, but also did so over text message on occasion. Snapchat is an instant messaging application typically used on phones, in which participants can send each other text messages, videos, and pictures. Snapchat messages are typically automatically set to delete, so there is no historical data available shortly after communications are exchanged.

32.     Only two days after first meeting, on November 7, 2022, Jane Roe again went back to John Doe's house after the two hung out, where they had consensual sex two times during the night. Jane Roe again spent the night with John Doe.

33.     On November 11, 2022, John Doe and Jane Roe hung out and again had consensual sex, this time in Jane Roe's dorm room, where John Doe spent the night.

**The True Events of November 17, 2023**

34.     November 17, 2023, into the early morning hours of November 18th, was the night of the incident that became the focus of the Title IX complaint. Between November 11th and November 17th, John Doe and Jane Roe continued to talk regularly over Snapchat and text message, and met each other at least once in person.

35.     November 17th began with Jane Roe sending a text message to John Doe asking if he wanted to hang out with Jane Roe and Roe's Friend by going to a bar called the Pourhouse. John Doe agreed, and picked up Jane Roe and Roe's friend and brought them back to his dorm to start the night. While at John Doe's dorm, the three hung out and had some alcoholic drinks with John Doe and many of his fraternity brothers. Every witness described observing John Doe and Jane Roe as seemingly very fond of each other, and acting like romantic partners.

36.     John Doe, Jane Roe, and Roe's Friend then went to the bar as planned. The three spent about a total of two hours at the bar and each had two drinks. John Doe and Jane Roe danced and hung out with each other. No witness reported seeing anything unusual. Around 11 pm, John Doe, Jane Roe, and Roe's Friend together decided to head back to John Doe's dorm. Shortly after, the three took an Uber ride together. While in the Uber, Roe's Friend described Jane Roe as "laughing and energetic."

37.     At approximately 11:20 pm, Jane Roe sent a text message to her recent ex-boyfriend (hereinafter, the "**Roe's Ex-Boyfriend**"), who, upon information and belief, Jane Roe had dated for approximately 3 years. The text message stated: "miss you." According

to Jane Roe's testimony under oath, despite not being together as of November 17, 2023, Jane Roe was still sexually active with Roe's Ex-Boyfriend, having had sexual intercourse with him at least once during the 12-days that Jane Roe and John Doe had known each other by this point.

38.    Around 11:40 pm, the three arrived back at John Doe's dorm. Video footage from outside John Doe's dorm shows Jane Roe, Roe's Friend, and John Doe excitedly running from the parking lot to John Doe's dorm entrance, with Jane Roe leading the way. When they arrived at the entrance, Jane Roe was seen on surveillance footage laughing and smiling as they entered the dorm, and there was no evidence of threats, intimidation, or coercion.

39.    Upon entering, the three went up to John Doe's room. Once there, the three hung out together talking and laughing. Just before 12:00 am, Roe's Friend left the room for about 20 minutes. During that time, John Doe and Jane Roe had consensual sex on John Doe's futon-couch. During the sex, John Doe recalled that Jane Roe's "nuvaring" contraceptive came out of her vagina which prompted a conversation because John Doe did not know what it was. After they finished having sex, Jane Roe asked John Doe whether he ejaculated, to which he responded that he had, and pointed to an area on the futon-couch where it landed. A photograph taken approximately 13 days later shows a white-ish stain on the futon-couch consistent with a semen stain.

40.    Around 12:20 am, Roe's Friend reentered the room. She noticed that Jane Roe was now wearing John Doe's sweatshirt, her pants were off, and the two of them were sitting on the futon-couch. Roe's Friend described that the three then talked for a period of time and that "things were normal and fine." She recalls that she and Jane Roe

were "just laughing together." Eventually, Roe's Friend noted that John Doe and Jane Roe began watching a movie together, which records confirmed was a movie called the "Interview" on Netflix.

41.     At approximately 12:23 am, Jane Roe texted Roe's Ex-Boyfriend "Be safe tonight please." Around that same time, and upon information and belief, shortly before this text, John Doe received three phone calls in a row that were unanswered. The calls showed a name on John Doe's phone of a girl that John Doe had recently dated. Upon information and belief, those calls were visible to Jane Roe.

42.     Around this same time, Roe's Friend was laying down on John Doe's roommate's bed, which was only about 8 feet away from the futon-couch where John Doe and Jane Roe laid. At that time, Roe's Friend began to "doze off." Minutes later, she heard a female "moaning" which she described as "[n]othing that would make me be alarmed… nothing that was weird… [i]n the moment I was just thinking 'ewe' and I just tried to go back to sleep." Quickly the moaning stopped, and Roe's Friend tried to go back to sleep, but never did. Minutes later, Roe's Friend heard the door to John Doe's room close, which made her turn. When she did, she saw that Jane Roe had left, and John Doe was sitting, fully clothed, on the futon-couch. Roe's Friend did not notice anything unusual about John Doe's appearance or demeanor. Rather, Roe's Friend asked John Doe to help her get down from the lofted bed, which he did by handing her the ladder.

43.     Roe's Friend did not describe hearing any screams, anyone saying "stop" or "no", any sounds of a physical struggle, sounds of aggressive intercourse, or anything that made her concerned. The moaning was the only thing she heard and it was short-lived.

44.     Separate from Roe's Friend description, and without knowing what she had recounted to the police and Title IX investigators, John Doe described the same time period with consistent details. He explained that after the three stopped talking, John Doe and Jane Roe laid on the futon-couch awake and watched a Netflix movie. Minutes later, John Doe tried to initiate consensual sex again with Jane Roe, as they had previously had sex two times in one night. John Doe did the same things he normally did to indicate an interest in having sex. He began rubbing Jane Roe's body, legs, and eventually her vagina area over her clothing. Initially, Jane Roe appeared interested by moaning. However, soon after, Jane Roe said that she was tired and did not want to have sex again. John Doe then stopped, and put his head down to fall asleep, remaining cuddled with Jane Roe. A short time later, he woke up to Jane Roe leaving the room.

45.     Phone records confirm that Jane Roe left the room around 1:05 am. Between 11:45 pm (when they returned to John Doe's dorm room) and 1:05 am, at least two other people entered John Doe's room: John Doe's roommate and one of his friends. John Doe's roommate recalls seeing Jane Roe and John Doe cuddled on the couch watching a movie, and did not see nor hear anything of concern. John Doe's friend recalls entering the room shortly after midnight and seeing what appeared to be two people having consensual sexual intercourse. Nothing about his observation made him concerned in any way.

46.     Indeed, no person described hearing or seeing anything of concern during the 11:45 pm - 1:05 am time frame.

**The Aftermath of November 17th**

47.     Both John Doe and Roe's Friend were confused as to why Jane Roe left the room. Roe's Friend went to use the bathroom, and saw Jane Roe who was crying and talking to Roe's Ex-Boyfriend asking him to pick her up. Call records show that the call was made at approximately 1:10 a.m.

48.     When Roe's Friend exited the stall, Jane Roe had left, so Roe's Friend returned to John Doe's room to get her things. A short time later she recalled seeing John Doe in the hallway talking with a couple of his friends, appearing to have "no idea what was going on." John Doe was in fact confused and did not know why Jane Roe had left and did not know where she was. Naturally, John Doe called Jane Roe, which phone records confirm was at 1:24 a.m. Jane Roe answered, and John Doe asked her where she went. Jane Roe responded that she was looking for Roe's Friend, and then ended the call.

49.     At approximately 1:25 a.m. Roe's Ex-Boyfriend arrived outside of John Doe's dorm facility. Around that time, John Doe heard a commotion outside and went to see what was going on. When he got near the doorway, he saw Roe's Ex-Boyfriend and one of John Doe's fraternity brothers arguing, recalling that Roe's Ex-Boyfriend was assertively demanding to know where Jane Roe was. John Doe then left that area, and returned shortly after. By that point Jane Roe was gone. Later, John Doe's fraternity brother explained that Roe's Ex-Boyfriend was accusing John Doe of sexual assault and other "wild sh*t," which made John Doe extremely upset.

50.     Video surveillance shows that Jane Roe left John Doe's dorm around 1:28 a.m., at which point, she went back to her dorm with Roe's Friend and Roe's Ex-Boyfriend. Roe's Ex-Boyfriend stayed and slept in the same bed with Jane Roe.

51.     At 7:38 a.m. that same morning (now November 18th), John Doe texted Jane Roe "we really need to talk about yesterday… please give me a call when u can." John Doe sent this message because it was apparent that Jane Roe was upset about something, and because John Doe was informed that Roe's Ex-Boyfriend was accusing John Doe of sexual assault. John Doe was confused about what was going on and wanted to clear things up with Jane Roe.

52.     Later that afternoon, around 12 p.m., Roe's Friend went to Jane Roe's room to talk about what happened. At first, Roe's Ex-Boyfriend was there. According to Roe's Friend, Jane Roe explained that she had gone to sleep when she arrived back at John Doe's dorm, and later woke up to him vaginally penetrating her while she was asleep. However, after Roe's Ex-Boyfriend left, Jane Roe admitted that she had consensual sex with John Doe shortly after arriving back at the dorm, but maintained that John Roe had penetrated her while she was sleeping later and that she screamed "stop" and "no." Roe's Friend reminded Jane Roe that she was in the room, and explained that she did not hear any of that, to which Jane Roe responded that Roe's Friend was sleeping and that Jane Roe could hear her snoring. Another friend was in the room during this conversation ("**Roe's Friend 2**"). Roe's Friend and Roe's Friend 2 contemporaneously texted during this exchange, which included the following exchange:

> Friend 2: her story ain't adding up… from what i'm hearing.
> **Roe's Friend:** [i know] I think the same. [H]ow do I rlly [sic] make her think about this.
> Friend 2: if she had the ability to moan, she had the ability to say no for you to hear it cause she KNEW you were in the room. [A]nd she said you were snoring knocked out.
> **Roe's Friend:** no fr [(aka, "for real")]
> Friend 2: trying to manipulate you into thinking you were asleep the whole time and didn't hear anything.
> **Roe's Friend:** [I know] I told her i 100% heard it

<u>Friend 2:</u> yeah doesn't seem right
**Roe's Friend:** idk what to do at this point
<u>Friend 2:</u> nothing you can do
**Roe's Friend:** yeah im changing the subject honestly

53.     Around the time of this text exchange, Roe's Friend had been encouraging Jane Roe to call John Doe to talk about what happened. Despite claiming that she was violently raped by John Doe, Jane Roe decided to call John Doe. Initially he did not answer because his phone was on silent while he was in a fraternity meeting. Around the third or fourth call in a row by Jane Roe, John Doe noticed the call, stepped out of the meeting, and answered.

54.     The call was on speaker phone on Jane Roe's end, so Roe's Friend heard the entire conversation. Roe's Friend, while not fully remembering all of the specific things each person said, stated that she would "describe the phone call as [Jane Roe] and [John Doe] being sweet to each other. [Jane Roe] was trying to explain what happened since she didn't say anything the night before. It wasn't a weird phone call, and no yelling took place. [Jane Roe] and [John Doe] were asking about each other's days." Roe's Friend later clarified that the call was "not completely sweet… [because] [John Doe] sounded distraught because he didn't know what was going on. [Jane Roe] was just responding. And then at one point they just started talking about each other's day. I was confused as to what was going on. [John Doe] was asking questions about what happened, and [Jane Roe] was responding with what happened from her point of view."

55.     John Doe's recollection was similar to Roe's Friend, in that he recalled most of the 11 minute call as being about things other than the night before and was overall positive. Regarding the prior night, Jane Roe told John Doe that she was uncomfortable with John Doe's advances for sex a second time. While John Doe was confused as to

why that was an issue in light of their previous sexual encounters, he apologized for making her feel uncomfortable because John Doe genuinely liked Jane Roe at that time, and never wanted to do anything that made her feel that way.

56.     Consistent with it being a positive conversation, for the rest of the day, Jane Roe and John Doe communicated over Snapchat with each other in the same way they had previously: jokes, pictures of each other making funny faces, etc.

57.     However, by 8 p.m., John Doe came to realize, without any warning, that Jane Roe had blocked him on Snapchat. Unbeknownst to John Doe, Roe's Ex-Boyfriend (in his words) "convinced" Jane Roe, after a two hour conversation, to tell her mother and sister, and "convinced" her to go to the hospital for a sexual assault examination, which Jane Roe did.

58.     Having realized that Jane Roe had abruptly blocked him, John Doe became concerned that Jane Roe was upset with him. Because John Doe truly liked Jane Roe, he texted her and apologized for making her upset stating: "[I] promise you my intentions have always been pure, [I] made a mistake." To be clear, this was not an admission of a violent rape; John Doe was not referring to a violent rape as a "mistake" or something that merely shows a lack of "pure intentions." Rather, John Doe was referring to what they discussed on their 11-minute phone call the day before: that Jane Roe was upset that he tried to initiate sex a second time.

59.     By the next day, November 19th, Jane Roe had not responded and still had John Doe blocked on Snapchat. In addition, John Doe learned that the police contacted his fraternity stating that they were looking into an incident from November 17th. At that point John Doe realized that Jane Roe might actually be claiming the things that Roe's

Ex-Boyfriend was yelling about the night before, i.e., sexual assault and other "wild shit." With this realization in mind, John Doe again texted Jane Roe to address that issue head-on, this time making clear that he was not apologizing for a rape that did not happen, stating in part: "i don't know if you're trying to use me as some way to get back with [Roe's Ex-Boyfriend] but this is not okay. [I] felt terrible that you were crying and upset all of yesterday that's what [I] apologized for. [Y]our regret for having a relationship me is not an excuse to destroy my name and character. [N]ot one girl has ever had a problem with me and if ur capable of going to these lengths to avoid responsibility shows your not the girl [I] thought you were."

60.     Since that last text, John Doe has not spoken with Jane Roe. As described further below, John Doe's fears had already been put in motion as Jane Roe initiated a police investigation, and, eventually, filed an official Title IX Complaint. The police investigation was closed in July 2023 without any charges against John Doe, but the Title IX investigations and proceedings went forward.

**The False Allegations Against John Doe**

61.     On November 18, 2022 at approximately 11 p.m., Jane Roe was convinced to go the hospital for sexual assault examination. During the examination, upon information and belief, Jane Roe falsely told the treating physician that "she awoke to find a male on top of her having vaginal intercourse with her." However, Jane Roe did not mention any concerns that she had been drugged, and no toxicology panel was performed. Upon information and belief, had Jane Roe mentioned concerns about drugging, a drug facilitated sexual assault kit could have been used to detect the presence of typical date-rape drugs given the timing of Jane Roe's examination relative to the

events of the night prior. There was no physical evidence from which any medical opinion could be rendered as to whether non-consensual sexual activity occurred.

62.    Approximately four days later, on November 22, 2022, Jane Roe made a criminal complaint to the UCONN police department (the **"Police Complaint"**). On December 8, 2022, Jane Roe testified at a hearing on a restraining order application (the "**Restraining Order Testimony**"). Finally, on January 13, 2023, Jane Roe submitted a complaint pursuant to UCONN's Title IX policies and procedures (the "**Title IX Complaint"**). While the details varied to some degree in each instance, in summary, Jane Roe alleged the following:

    a.  Jane Roe mentioned going to the bar with John Doe and Roe's Friend, but did not make any allegations of drugging or incapacitation.

    b.  Jane Roe indicated that she willingly went back to John Doe's dorm, but falsely claimed that they left "around 12:30 a.m.," when in fact, video surveillance confirms that they *arrived* back at John Doe's dorm at 11:42 p.m.

    c.  Upon returning to John Doe's dorm, Jane Roe alleged that "...[John Doe] sat next to me and started touching me on my thigh area. I told [John Doe] 'no' and said that I was tired (I felt groggy) and wanted to sleep. [John Doe] stopped at that point and handed me a sweatshirt and left the room. I took off my jeans and the body suit I was wearing… put on [John Doe's] sweatshirt and left my underwear on."

    d.  Jane Roe then alleged that she was awakened at approximately 1:00 a.m. with "[John Doe] on top of me from behind with his penis inside me." She claimed she said "what are you doing get off of me," and "screamed" "no" and "stop." Jane Roe further stated "I was in pain as I struggled to get [John Doe] off of me. [John Doe] forcefully placed his hand over my mouth and stuck his fingers in my mouth. I believe he did that because he did not want anyone to hear me yelling. I finally broke free from him and ran from the room, as I was getting away I saw my phone on the floor and grabbed it."

    e.  Jane Roe then claimed that she went to the bathroom and noticed that she was bleeding before calling Roe's Ex-Boyfriend to come get her.

63.    Jane Roe's allegations were false. Moreover, Jane Roe failed to mention, among other things, the following facts which were corroborated by reliable and objective evidence: (i) that she had consensual sex with John Doe upon returning to the dorm, (ii) that Jane Roe, Roe's Friend, and John Doe were together in John Doe's room talking and laughing after they had consensual sex, (iii) that she and John Doe watched a movie together and cuddled on the couch, (iv) that she texted Roe's Ex-Boyfriend at 12:23 a.m., (v) that Roe's Friend was in John Doe's room the entire time that she claims a violent rape was occurring, (vi) that she saw and spoke to Roe's Friend while she was in the bathroom, (vi) that she spoke to Roe's Friend about the events the next day, or (vii) that she called and spoke to John Doe the next day and had a "sweet" conversation and later Snapchatted with him.

**The Title IX Investigation and Jane Roe's Changing Stories**

64.    A student conduct officer was appointed by UCONN, who was tasked with conducting the investigation into the Title IX Complaint (the "**Title IX Investigato**r"). On January 25, 2023, the Title IX Investigator met with Jane Roe for an investigative interview (the "**January 25th Interview**").

65.    In the January 25th Interview, Jane Roe alleged that the "struggle" between her and John Doe – which consisted of screams, physical assaults, and forcible intercourse – lasted for "two or three minutes." However, Jane Roe did not list Roe's Friend as a potential witness or mention her at all during her interview, despite her being in a bed mere feet away during the "struggle." In fact, none of the witnesses Jane Roe listed were with Doe and Roe at all during November 17th through the time of the incident.

In addition, with the exception of Roe's Ex-Boyfriend, all witnesses refused to participate in the Title IX process and be interviewed by the Title IX Investigator.

66.     During the January 25th Interview, Jane Roe claimed that she realized her underwear was "soaked in blood" upon entering the bathroom. However, Jane Roe omitted that she saw Roe's Friend in the bathroom right after the incident, and that the police had seized and photographed her underwear. Photos received in November 2023 did not appear consistent with being "blood-soaked."  Further, during the interview, Jane Roe did not mention speaking with John Doe after the incident, and never submitted screenshots of her call log, despite telling the Title IX Investigator during the January 25th Interview that she would submit screenshots of call logs. And while Jane Roe submitted a few screenshots of text messages from her phone, each of them misleadingly omitted prior and subsequent conversations that were important for context.

67.     On February 13, 2023, the Title IX Investigator interviewed Jane Roe again (the "**February 13th Interview**"). In this interview, Jane Roe claimed, for the first time that she thought she "was roofied or [John Doe] put something in my drink to make me feel like that because I have never felt like that by consuming alcohol. When he ordered the drink there were too many people by the bar so I could not see the drinks being made." In addition, Jane Roe claimed that on November 11, 2022 – one of the nights that Jane Roe and John Doe had consensual sex – that John Doe "tried to ejaculate in me" suggesting that encounter was also non-consensual. Jane Roe claimed that as a result of the November 11th incident that she "lost trust" in John Doe and that she was "really scared." Following this new narrative, Jane Roe also began to claim that she did not want to go back to John Doe's dorm on November 17th after the bar.

68.     On March 14, 2023, Title IX Investigator interviewed Jane Roe for a third time (the "**March 14th Interview**"). This time, the Title IX Investigator confronted Jane Roe about some of the objective evidence she had been provided by John Doe and others which did not align with Jane Roe's claims. Specifically, for the first time during the Title IX process, Jane Roe admitted that she saw and spoke to Roe's Friend in the bathroom after leaving John Doe's room. Regarding Jane Roe's call to John Doe the next day, Jane Roe claimed she did not "really remember much that day" but then attempted to shift the blame for the phone call to Roe's Friend claiming that she remembered "[Roe's Friend] was trying to get [Jane Roe] to speak to [John Doe] over the phone…" Ultimately, Jane Roe claimed that she did not remember whether she spoke to John Doe at all the next day, despite call logs showing that they spoke for 11 minutes. Jane Roe also denied telling Roe's Friend that she had consensual sex with John Doe during conversations the following afternoon. When asked for details about what she told Roe's Friend, Jane Roe conveniently could not remember or claimed she did not know.

69.     By the third interview with Jane Roe, the Title IX Investigator had only conducted one Interview with John Doe, which was on February 10, 2023. Prior to that interview, John Doe submitted a 6-page written statement detailing all of his contacts with Jane Roe and meticulous details about November 17th and its aftermath. John Doe also provided the Investigator with various documents, including: (i) all text messages with Jane Roe, (ii) call logs from his cell phone carrier, (iii) streaming logs from Netflix showing the movie he and Jane Roe watched after midnight on November 18th, and (iv) high-resolution photos of his dorm room shortly after the incident, including closeups of the couch. During the interview with the Title IX investigator, John Doe answered all

questions, and followed up with a list of six witnesses, including Roe's Friend who he had not spoken to since November 18th.

70.     From February 10th through April 3rd, John Doe had not heard anything of substance from the Title IX Investigator. The reason for the silence was revealed on April 3, 2023, when John Doe received a letter from the Title IX Investigator which informed John Doe that the delay was due to the investigator "waiting on guidance on how to move forward with the case… [because of] additional allegations [which] were identified of sexual exploitation…" Apparently, based solely on Jane Roe's responses in the course of interviews, UCONN took it upon itself to initiate new and separate official complaints based upon Jane Roe's drugging allegations and the alleged non-consensual ejaculation during sex on November 11, 2022.

71.     UCONN never revealed who was providing "guidance" to the Title IX Investigator, and provided no detail about these closed-door meetings. Yet, despite no formal request by Jane Roe, UCONN transformed Jane Roe's vague and uncorroborated comments into official Title IX charges, as John Doe received official notices for potential violations based upon those new allegations.

72.     On April 11, 2023, John Doe interviewed with the Title IX Investigator concerning these new allegations. John Doe categorically denied the allegations, because they were in fact false, and provided further evidence to corroborate his version of events, as he had done at all stages of the Title IX process.

73.     While UCONN was obsequious as it related to any allegation floated by Jane Roe, it was not nearly as eager, or even willing, to initiate official Title IX charges or investigations as it pertained to John Doe's claims about Jane Roe. For example, despite

John Doe repeatedly saying that Jane Roe's claims were false, and having provided substantial evidence demonstrating material falsehoods and omissions made by Jane Roe, UCONN did not initiate any formal investigations or complaints against Jane Roe, despite the fact that it is an explicit Title IX violation for a student to provide false information to investigators during the course of Title IX proceedings.

74.     Similarly, John Doe shared with the Title IX Investigator that Jane Roe was engaging in a pattern of harassment and intimidation by repeatedly coming to events that were being held at John Doe's fraternity house and/or hosted by his fraternity, knowing that he would be there. While at the events, Jane Roe would stare at John Doe with her friends, while they whispered to each other and snickered. Several witnesses corroborated these events. Yet, despite there being a "no-contact" directive between John Doe and Jane Roe (which went both ways), and despite UCONN's Title IX rules explicitly prohibiting any form of harassment or intimidation toward any party to a Title IX investigation, UCONN did not initiate a formal complaint on John Doe's behalf, or do anything to investigate the claims further.

75.     Further, information obtained after the Title IX proceedings concluded show that that UCONN intentionally or recklessly failed to investigate, obtain, and/or disclose surveillance footage and other information that was within UCONN's possession and/or control throughout the investigation, which was exculpatory to John Doe and further undermined Jane Roe's false claims.

76.     Specifically, pursuant to a Freedom of Information Act Request made in May 2023, John Doe received documentation from the police in November 2023 regarding the closed criminal investigation (the "**FOIA Documents**"). In the FOIA

Documents was information which was exculpatory to John Doe and clearly demonstrated the falsity of some aspects of Jane Roe's claims. For example the FOIA Documents included:

    a. Still shots from surveillance cameras outside of John Doe's dorm. These undermined Jane Roe's claim that she did not want to go back to John Doe's dorm, and reluctantly went there only at the behest of Roe's Friend. The surveillance footage showed that upon returning to the dorm, Jane Roe, Roe's Friend, and John Doe were all happily running from the parking lot to the entrance of the dorm, with Jane Roe sprinting ahead to lead the way. Once they arrived at the door, the three could be seen laughing with Jane Roe playfully stumbling to the ground as she tried to pick up John Doe's key card which he had accidentally dropped.

    b. The surveillance footage further confirms the timeline given by John Doe and Roe's Friend, and categorically refuted Jane Roe's claim that they had not even left the bar until around 12:30 a.m.

    c. The documentation also showed that Jane Roe deliberately provided false information when she claimed that she had made a report to the police sometime after January 2023 to claim harassment and intimidation by John Doe and his friends since making the complaint. In fact, the FOIA Documents contained no report by Jane Roe concerning anything other than her initial complaint to the police from November 2022.

77.    By the time investigation concluded in early June 2023, virtually all aspects of Jane Roe's claims were severely undermined, if not categorically disproven by all other corroborating and objective evidence which was either revealed during the investigation, or from information which could have been obtained by UCONN with reasonable effort. To wit:

    a. Jane Roe's claim that she had "lost trust" in John Doe on November 11th, was belied by her own testimony under oath and text messages between her and John Doe. Specifically, during the Restraining Order Testimony, when asked why she went back to the dorm with John Doe on November 17th, Jane Roe testified: "...I thought Joe was a nice guy, so –- and I've hung out with him before, *I trusted him*, so I was like okay, I guess." Likewise, text messages showed that Jane Roe had texted John Doe multiple times between November 11th and November 17th calling him

"babe" and even called upon John Doe on November 13th to help her and Roe's Friend with car issues.

b.  Jane Roe's claim that she did not want to hang out with John Doe on November 17th was belied by her own text messages which show that on November 17th, *she invited* John Doe to go to the bar with her and Roe's Friend and asked John Doe to pick them up.

c.  Jane Roe's claim that she was "roofied" at the bar by John Doe was contradicted by her repeated omission of those claims to the police and Title IX, and the lack of any medical corroboration despite their being a procedure available to determine whether any drugs were in her system if she had raised this concern. In fact, there was no evidence of any form substantiating this claim, including that not a single lay witness said that Jane Roe had made this claim at any time or that she appeared incapacitated on the night of November 17th.

d.  Jane Roe's claim that she did not want to go back to the dorm was refuted by the statements of John Doe, Roe's Friend, and the surveillance video which showed her happily running back to John Doe's dorm. On the other hand, not a single witness confirmed Jane Roe's claims of reluctance or fear regarding going back to John Doe's dorm.

e.  Jane Roe's claims about when they returned to John Doe's dorm was refuted by the statements of John Doe, Roe's Friend, and the surveillance video, all which showed that she was off by at least 45 minutes.

f.  Jane Roe's claim that she did not have consensual sex with John Doe upon returning to the dorm was refuted by the statements of John Doe, Roe's Friend who confirmed that Jane Roe admitted it to her the next day, and Jane Roe's own testimony during the Restraining Order Hearing in which she claimed that she "couldn't remember" whether they had consensual sex earlier in the night on November 17th. Beyond that, there was a photograph showing a stain on John Doe's couch which appeared to be consistent with semen. Jane Roe's story about the alleged rape did not include any ejaculation.

g.  Jane Roe claimed that she went to sleep immediately upon returning to the dorm, that John Doe left the room, and that she did not wake up until around 1 a.m. when John Doe allegedly assaulted her. This was disproved by John Doe's statements and all of the corroborating evidence, like the stain on the couch, a log showing that they watched a movie as John Doe claimed, and the testimony of witnesses who walked in and saw them together. In addition, Roe's Friend recounted how she returned to the room around 12:20 a.m. and hung out with John Doe and Jane Roe laughing and talking before laying down in John Doe's roommate's bed through the point that

Jane Roe left the room to call Roe's Ex-Boyfriend. Even Jane Roe's own text messages refute her claim, as they show that she sent Roe's Ex-Boyfriend a text message at 12:23 saying "hope you are safe" when she would have been sleeping according to her story.

h. Jane Roe claimed that John Doe forcefully penetrated her just before 1 am, that she "screamed" "no" and "stop" *before* John Doe covered her mouth, and that a violent struggle occurred for about 2 or 3 minutes before she was able to push him off and run out of the room. This was disproved by John Doe's statements which were corroborated by witnesses who came into the room and did not see any issue of concern. Most critically, it was completely disproven by Roe's Friend who categorically denied hearing anything like what Jane Roe described, let alone screams and a violent struggle. There was no evidence of marks, scratches or bruises on Jane Roe's body from the struggle she described, with Roe's Friend specifically saying that she did not notice any injuries.

i. Jane Roe claimed that she was bleeding profusely from her vagina because of the assault and that her underwear was "covered" in blood. However, there was no evidence of blood anywhere in John Doe's room, on the couch, or in the bathroom. Roe's Friend did not notice blood, and no witness stated that they saw blood at any point. In addition, photographs obtained from the FOIA Documents do not show blood-soaked underwear.

j. Jane Roe claimed that she had not talked to John Doe after the incident at all. However, this was disproved by call logs which showed that John Doe called and spoke to her at 1:24 a.m. on the night of the incident, and at 1:09 p.m. the next afternoon after Jane Roe called John Doe and spoke for 11 minutes. Jane Roe's contact with John Doe was confirmed by Roe's Friend who spoke to Jane Roe the next day and was in the room for the phone call which was on speaker phone. Roe's Friend's statement in this regard was corroborated by contemporaneous text messages with a friend as these events were playing out.

k. Jane Roe denied that Roe's Friend told her the next afternoon that she was in the room and did not hear anything. Jane Roe also denied that she tried to persuade Roe's Friend to say that she was sleeping and could not hear anything that happened. However, contemporaneous text messages between Roe's Friend and Roes' Friend 2 prove that Jane Roe and Roe's Friend in fact had the exact conversation recounted by Roe's Friend.

78.    In sum, not a single witness or piece of objective evidence confirmed any part of Jane Roe's story from the point of deciding to hangout with John Doe through the point of the alleged assault. To the contrary, every witness and source of evidence that

was available verifiably refuted her claims. And that is on top of the fact that Jane Roe was materially inconsistent with details throughout the investigative process.

79.     The Final Title IX investigative report was completed by the Title IX Investigator on June 14, 2023. The Title IX investigator determined that there was insufficient evidence to substantiate sexual exploitation based upon the November 11th allegations and the drugging complaints. Because of that determination, no hearing needed to be held on those claimed violations.

80.     However, the Title IX Investigator did not make a determination as to whether Jane Roe's allegations of sexual assault were substantiated based upon her claims of the drugging and subsequent alleged conduct in John Doe's dorm room. Instead, the Title IX Investigator limited the factual issues in dispute to the following four issues, which were to be decided upon a hearing: (i) "Whether [John Doe] 'roofied' or 'drugged' [Jane Roe] during the late hours of November 17, 2022, and early hours of November 18, 2022"; (ii) "Whether [John Doe] inserted his penis into [Jane Roe]'s vagina during the early morning hours of November 18, 2022, while [Jane Roe] was asleep or incapacitated"; (iii) "Whether [John Doe] engaged in sexual activity with [Jane Roe] after [Jane Roe] stated, 'No' and 'Stop'"; and (iv) Whether [John Doe] forced [Jane Roe] to continue in sexual activity by inserting his fingers inside [Jane Roe]'s mouth and down [Jane Roe]'s throat to 'muffle [Jane Roe's] screaming.'"

**Leading Up to the Title IX Hearing**

81.     After the investigation was complete, hearing dates were offered to John Doe between July 12, 2023 and July 17th. John Doe selected the earliest date, which was July 12, 2023.

27

82.     On June 29, 2023, John Doe was provided a portion of Jane Roe's medical records, which John Doe had requested earlier in the investigation but were not provided. The partial records consisted of Jane Roe's sexual assault examination from November 18th. These records were submitted right before the weekend heading into the 4th of July week. John Doe requested a 5-day continuance of the hearing so that he could have an opportunity to have them reviewed by a medical expert, and noted the difficulty of finding someone due to the upcoming holiday. However, despite John Doe requesting a short extension to a date that was previously offered by UCONN for the hearing, UCONN denied it without any explanation.

83.     On July 7, 2023, John Doe requested that he be able to allocate 15 minutes for the opening statement and reserve 5 minutes for the closing argument. UCONN denied this request despite their procedures calling for 20 total minutes for opening statement and closing argument (10 minutes each).

84.     Prior to the hearing, UCONN also excluded relevant evidence proffered by John Doe. One instance was portions of Jane Roe's testimony under oath in which she admitted to having sexual relations with Roe's Ex-Boyfriend around the time of November 17th. UCONN excluded this evidence claiming that "past sexual activity is not relevant to the incident we are discussing in the hearing." In response, John Doe pointed out that he was offering the evidence for an alternative purpose which is permitted under UCONN's Title IX rules. However, UCONN maintained its position without further explanation.

85.     UConn also excluded John Doe's offer of a portion of Jane Roe's testimony under oath in which she explicitly stated that "I thought Joe was a nice guy... I trusted him, so I was like okay..." when deciding to go back to John Doe's dorm. This was being

offered to contradict Jane Roe's new claim that she stopped trusting John Doe at least 5 days before November 17th and did not want to hang out with him that night, or go back to his dorm. Yet, despite the clear relevant purpose, UCONN excluded the evidence without explanation.

86.    John Doe also requested whether he would have an opportunity to know the identity of the Panel Members and their background prior to the hearing. UCONN responded that it would not provide that information and that there was no formal way to object to the Panel Members on the basis of bias prior to the hearing.

87.    Upon information and belief, the individual Panel Members were in fact biased against John Doe and other male participants in the Title IX process because of their training, life experiences, prior held views, and participation in UCONN's Title IX program which is systematically biased against male parties.

**The Title IX Hearing**

88.    July 12, 2023 was the first day of the Title IX hearing. John Doe has since learned that on that same day the police contacted Jane Roe to inform her that the criminal investigation would be closed without any charges against John Doe. It is unclear whether this information was also communicated to the UCONN, and if so, to whom.

89.    Once the hearing began, it was evident that UCONN was willing to permit Jane Roe and her attorney advisor to run roughshod over the hearing process, despite UCONN's Title IX policy prohibiting advisors to do anything except question witnesses, and requiring an advisor to "maintain respectful and professional decorum in all proceedings…" UCONN's Title IX policy further states that "failure by the advisor to do so may result in the Office of Community Standards excluding the advisor from participation."

90.     Right at the beginning, Jane Roe's advisor stated her "objection" to the fact that the Title IX Investigator dismissed the claims of sexual exploitation regarding the claim Jane Roe introduced in the middle of the Title IX investigation process of non-consensual ejaculation on November 11th – 6 days prior to the primary incident in question. This was done in front of the Panel Members, and UCONN did nothing to stop it despite the fact that John Doe's advisor specifically raised a concern to a UCONN Title IX administrator that Jane Roe might try to improperly put such evidence before the Panel Members, in spite of the Title IX Investigator's decision. The Title IX administrator told John Doe's advisor that he was not permitted to object under UCONN's rules. However, the Title IX administrator promised that the hearing chairperson would be alerted to this issue prior to the hearing. Despite that promise, UCONN did nothing to stop Jane Roe's advisor from making that claim in front of the Panel Members.

91.     In addition, Jane Roe's advisor was allowed to spend a large portion of the two-hour hearing questioning witnesses about a fire alarm that went off in John Doe's dorm approximately 3 hours after Jane Roe had left John Doe's dorm on the night of the incident. The next day, John Doe's fraternity brothers had a meeting about who caused the alarm to go off, because it caused a major disruption and required the fire department to come to the dorm in the middle of the night. The conspiracy theory proffered by Jane Roe's advisor was that either the fire alarm did not actually go off, or was purposefully pulled, all so that the fraternity could have a fraternity-wide meeting the next day for the purpose of "lining up their stories" about Jane Roe's allegations. As absurd as this was on its face, it was even worse when considering that John Doe provided the group text messages amongst his fraternity brothers in which they were clearly discussing the fire

alarm issue and calling for a meeting. Yet, despite the absurdity of this theory, UCONN permitted Jane Roe's advisor to ask unlimited questions about that issue and did not exclude her from the hearing.

92.     During the first day of hearing, Jane Roe refused to answer several questions on cross-examination, which UConn permitted her to do. John Doe, on the other hand, did not refuse to answer any question.

93.     Moreover, when Jane Roe did answer questions, her answers to questions asking her to reconcile inconsistencies were patently incredible. For example, in regard to her new claims that she did not trust John Doe, nor want to be with him at all that night, John Doe's advisor questioned Jane Roe about the various text messages she sent to John Doe calling him "babe" and inviting him to hang out with her and Roe's Friend. Jane Roe's response was that she did not recall whether she sent the messages, and then introduced yet another new, incredible theory: *that Roe's Friend might have actually taken her phone and sent various messages to John Doe over the span of days and hours purporting to be Jane Roe.* Of course, there was no evidence that Roe's Friend even had the passcode to Jane Roe's phone to do this, let alone that this could have possibly happened without Jane Roe ever realizing or saying anything to anyone about it until almost one year later.

94.     Because the hearing did not complete on July 12th, a second day of hearing had to be scheduled. John Doe accommodated several requests for hearing dates offered by UCONN. Yet, every time a date was scheduled, John Doe was informed that it had to be changed, which upon information and belief, was because of requests made by Jane Roe because of various vacations which UCONN permitted.

31

95.     Eventually August 11th was set as the 2nd hearing date, but yet again, UCONN contacted John Doe to request his availability for other dates because of a "scheduling conflict." Sensing that this was in fact due to Jane Roe, John Doe voiced his opposition via email, reminding UCONN about how it denied John Doe's single request for a short extension, predicated upon a meritorious reason that was out of his control. After voicing this concern, UCONN finally enforced its rules against Jane Roe and stated that the hearing would go forward on August 11th.

96.     On August 11, 2023, the second day of hearing went forward. Jane Roe was not present, but her advisor was. Immediately, Jane Roe's advisor again started the hearing by stating an objection to the proceeding because Jane Roe could not be present. When it became clear that the advisor was planning on participating in the hearing in lieu of Jane Roe, John Doe, through his advisor, reminded the panel that UCONN's Title IX policy states that "[t]he advisor may not participate in the proceedings in lieu of the party; the party must maintain meaningful participation in all proceedings." In response, one of UCONN's Title IX personnel merely stated "we've done this in the past" demonstrating UCONN's lack of knowledge of its own rules and complete disregard for following them.

97.     During the hearing, Roe's Ex-Boyfriend testified. John Doe's advisor was precluded from asking whether Jane Roe had told him that Jane Roe and John Doe had consensual sex prior to the night in question. This was specifically relevant given that Roe's Ex-Boyfriend was permitted to testify, in response to questions by Jane Roe's advisor, that in his opinion Jane Roe had always been honest with him. To that end, the question about Jane Roe's honesty in regard to prior sexual interactions with John Doe sought to demonstrate that she in fact had not been transparent or honest with him.

98.     When it came time for closing argument, UCONN allowed a written closing argument, purportedly written by Jane Roe, to be read to the Panel Members by the hearing chairperson, despite Jane Roe not being present, and despite there being no basis under the Title IX policy to allow such procedure. John Doe had no advanced notice that this was going to occur and no opportunity to oppose it.

99.     Once the hearing concluded, the Panel Members were given 10 days to deliberate and issue a decision.

**The Panel Members' Decision**

100.    All of the information articulated above was presented and available to the Panel Members.

101.    On August 21, 2023, the Panel Members issued a written decision, which found John Doe in violation based upon "statements made by the involved parties and the timeline presented which presented a preponderance of evidence to find the respondent responsible for unwanted sexual contact on November 18, 2022 in Husky Village." The decision further explained that:

> [b]ased on the information gathered from witness statements as well as statements made by the Complainant and Respondent. It is more likely than not that he engaged in sexual activity at approximately 1:00 AM due to the muffled moaning heard and the corroboration that the Complainant left the room extremely upset after the muffled moaning was heard and immediately made an outcry statement to a witness. This information provided a preponderance of evidence that there was sexual activity at 1:00 AM and it was nonconsensual seeing as the Complainant did not verbally or nonverbally consent to the sexual intercourse that occurred.

102.    However, the decision was fundamentally flawed because it, among other things: (i) contained erroneous and arbitrary conclusions, (ii) misstated facts, (iii) ignored irrefutable or undisputed evidence, (iv) created new evidence that did not exist, (v)

33

misapplied the preponderance standard, (vi) failed to decide the issues actually noticed, (v) failed to decide it based upon the allegations actually made by Jane Roe, (vi) reflected an inherent bias against the male, John Doe, (vii) failed to reconcile contradictory evidence without explanation, and (viii) failed to account for the various concerns about Jane Roe's credibility, including her refusal to answer several questions.

103.    Without any explanation, the Panel Members did not answer any of the four issues of fact noticed by the Title IX Investigator. For example:

   a.  *Did John Doe drug the Complainant despite the absence of medical evidence and everyone claiming that Jane Roe did not appear at all incapacitated?* The Panel Members said they did not consider that claim as relevant to the issue of whether a non-consensual sexual encounter occurred. Instead, they brushed it aside as "more of a 'feeling' on [Jane Roe's] part."

   b.  *Did John Doe insert his penis into Jane Roe's vagina while she was asleep or incapacitated?* The Panel Members did not even attempt to address the claim of incapacitation, and never decided whether any "unwanted sexual contact" happened while the Jane Roe was asleep or awake.

   c.  *Did John Doe engage in sexual intercourse with Jane Roe after she screamed "no" and "stop"?* One can only guess what the Panel Members thought, because they only stated that there were "muffled moans" – a description that no witness provided – and that some unspecified "sexual activity" occurred to which Jane Roe did not consent verbally or nonverbally.

   d.  *Did John Doe force Jane Roe to continue sex by inserting his fingers inside Jane Roe's mouth and down her throat to muffle her screams while he violently restrained her?* Again, the Panel Members did not commit to an answer. Instead, they said that it was "unclear if the moaning was sounds of struggle by the [Jane Roe] while her mouth was covered or something else." In terms of how that "muffling" occurred, the Panel Members provided no details.

104.    It was obvious why the Panel Members evaded answering the issues of fact noticed by the Title IX Investigator and why they did not decide the case based upon

allegations actually made by Jane Roe: they could not have squared the evidence with Jane Roe's allegations.

105.   The decision misstated evidence or made up new evidence not in the record at least seven different times. For example:

     a.   No witness described hearing "muffled moans" from Jane Roe, yet, the decision referenced "muffled moans" three separate times.

     b.   The decision stated that Jane Roe alleged that after John Doe made sexual advances, John Doe "stopped and [Jane Roe] changed into his clothes *and the two laid on the futon*." However, Jane Roe never alleged that. Instead, she alleged that John Doe left the room and *she* laid on the futon alone.

     c.   On the same topic, in an attempt to make it seem like the parties' claims aligned, the decision states that after attempting to initiate a second round of sex, John Doe "stated that [he] *then gave the Complainant a change of clothes and they both went to sleep*." John Doe never said that. John Doe said he gave Jane Roe a change of clothes after they had consensual sex, and before he, Roe's Friend, and Jane Roe all hung out together before snuggling to watch a movie, all of which occurred *before* he tried to initiate a second round of sex.

106.   The decision contained several erroneous conclusions, such as the conclusion that "there were no firsthand accounts of the entire alleged sexual encounter." That is belied by John Doe's account of the entire sexual encounter and Roe's Friend, who heard everything that happened. An account of an event based upon a contemporaneous sensory perception, such as hearing, is in fact a "firsthand account."

107.   The decision ignored undisputed and/or objective evidence in order to conform the evidence to the Panel Members' desired conclusion. For example, none of Jane Roe's claims which were overwhelmingly contradicted by the evidence were discussed in the decision, like the phantom drugging claim, the phone calls that Jane Roe claimed did not happen or that she could not remember, or her insistence that Roe's

Friend was not in the room on the night of the incident or the next day when she called John Doe.

108.   The decision reflected a bias in favor of the female Jane Roe, and against the male John Doe. For example, the Panel Members deemed Roe's Ex-Boyfriend – Jane Roe's only witness, who had *no first hand knowledge* of any of the events at issue – an "Outcry Witness," an undefined term that was repeated three different times in the decision. As applied in the decision, it was apparent that the Panel Members were privy to this term of art that is typically applied in other legal contexts and is not a colloquial term within the common vernacular of the public, nor is it a defined term in UConn's Title IX policies.

109.   Further, the decision did not attempt to reconcile any of Jane Roe's incredible testimony and evasive conduct. For example, the decision did not once mention Jane Roe's failure to answer questions, or comment on the various nonsensical answers she provided throughout the investigation and hearing, such as her claim that Roe's Friend was actually responsible for all of the romantic texts to John Doe that undisputedly came from Jane Roe's phone.

110.   The decision also reflected that the Panel Members fundamentally misunderstood and/or misapplied the "preponderance of the evidence" standard. For example, the decision stated that it was "*unclear* if the moaning was sounds of struggle by the Complainant while her mouth was covered or something else" suggesting that there was insufficient evidence to draw a conclusion one way or the other.

**The Title IX Appeal**

111.    John Doe timely submitted an appeal raising 14 different grounds. However, the Appeal Officer Clokey summarily denied the appeal. In doing so, the appeal decision, among other things: (i) misstated the Title IX rules, (ii) mischaracterized the evidence, (iii) mischaracterized the conclusions of the hearing decision, (iv) provided inaccurate justifications for upholding the hearing decision, (v) reached arbitrary conclusions that were not rationally based upon the record, (vi) reached erroneous conclusions, (vii) ignored evidence which contradicted its conclusions, and (viii) otherwise applied the rules in a manner which reflected bias against the male party, John Doe.

112.    Among the glaring examples of how the appeal decision avoided confronting the issues with a rational and reasonable analysis, is in response to the claim that Panel Members misstated facts in order to conform the evidence to their desired conclusion. The appeal decision did not even attempt to explain how the cited examples of misstatements were in fact accurate or how they were supported by any evidence in the record. Instead, the appeal decision merely stated that the "Hearing Officers weighed all of the information and outlined the information that they considered in reaching their decision. I do not find any deviation from the prescribed procedures."

113.    An erroneous outcome, so blatant and unjust, was unfortunately a decade in the making.

## UCONN Succumbs to Decade-Long National Trend and Permits Systemic Bias to Infect Title IX Administration

### A. The Dear Colleague Letter:  Original Sin Launching Federal Pressure Upon America's Universities to Increase Number of Title IX Reports

114.    On April 4, 2011, the Office of Civil Rights ("**OCR**") of the U.S. Department of Education ("**DOE**") issued a guidance letter to colleges and universities in receipt of

federal funding, which became widely known as the "Dear Colleague Letter" (the "**DCL**").

The DCL advised recipients that sexual violence constitutes sexual harassment within the

meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. and

its regulations, and directed schools to "take immediate action to eliminate the

harassment, prevent its recurrence, and address its effects."  DCL at 4.  The DCL was

drafted and implemented in response to a since-widely debunked academic study which

claimed only "1 in 5" sexual assaults which occurred on college campuses were being

reported.

115.    Despite its purported purpose as a mere guidance letter, the Department of

Education treated the DCL as a binding regulation and pressured colleges and

universities to aggressively pursue investigations of sexual assault on campus.

116.    The DCL, while not *completely* ignoring due process concerns, suggested

that schools should focus more on victim advocacy.

117.    On April 19, 2014, the OCR issued additional directives to colleges and

universities in the form of a guidance document titled Questions and Answers on Title IX

and Sexual Violence (the "**2014 Q&A**"). Like the DCL, the 2014 Q&A was aimed at

addressing educational institutions' sexual misconduct policies, including the procedures

schools "must" have in place "to prevent sexual violence and resolve complaints" and the

elements that "should be included in a school's procedures for responding to complaints

of sexual violence."

118.    In the same month that the OCR issued its 2014 Q&A on Title IX, the White

House issued a report titled Not Alone, which included a warning that if the OCR finds a

school in violation of Title IX, the "school risks losing federal funds." See White House

Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("**DOJ**") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

119.   In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  See Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26, 2014),

https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

120.   To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. See Title IX: Tracking Sexual Assault Investigations, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited April 2, 2020).

121.   The DCL and OCR put considerable pressure on universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." See Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of

Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.

122.    The Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." Id.

123.    Indeed, a 2014 white paper issued by the Association of Title IX Administrators ("**ATIXA**"), titled, *Equity is Such a Lonely Word*, functionally directed colleges to tilt their investigations in favor of women:

> [C]ampuses for so many years considered only (or primarily) the rights and situation of the accused. Thus, equity ends up feeling like a shift to victim's rights, even though it is not. Ultimately, the pendulum should shift to the middle, rather than to either party, but *because victims have been historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum* to right the historical imbalance.

(emphasis added).

124.    The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . . It's really a surreal situation, I think." See Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014),

https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.  Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

125.    Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  See supra, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them.*

126.    Notably, a study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates and has no negative impact on securing donations.  See Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852. The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students."  Id.  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." Id.  In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

127.    Over the last decade, the federal government has placed tremendous pressure on UCONN, and all schools, to increase the reporting of sexual misconduct (the sheer number of reports, regardless of validity), including the issuance of the infamous Dear Colleague Letter and the slew of OCR investigations into major universities, like UCONN, that ensued.

128.    Another form of federal pressure came in the way of federal grants through the Department of Justice's Office on Violence Against Women ("**OVW**").  The OVW Stop Campus Sexual Assault Grants would give universities anywhere from low-to-mid, or even high, six figure grants annually to bolster their Title IX sexual misconduct response (i.e. logging number of sexual assaults reported, and cases opened by Title IX).  OVW, the federal government, and schools were only interested in whether cases were being reported by the schools and that Title IX investigations were being started.  Nobody cared what the final outcomes were, or whether a generation of guys were getting completely railroaded.  The grants, and OCR pressure worked (unfortunately).  The number of sexual assault reports exploded between 2012 and 2016, shooting from a number in the thousands to tens of thousands.

129.    In response to pressure from OCR and the DOJ, educational institutions like UCONN severely limited the procedural protections afforded to male respondents, like John Doe, in sexual misconduct cases.

### B. The Rescission of the 2011 DCL and UCONN's Continued Reliance on an Unfair, Unreliable, Widely Discredited Process.

130.    On July 19, 2017, twenty State Attorneys General published a letter to the United States Secretary of Education, Betsy DeVos ("**DeVos**"), urging the Secretary to maintain the sexual assault guidelines for college campuses as set forth in the DCL, and

related guidance and regulations, despite the obvious due process violations occurring on college campuses across the country.  Among those signing the letter was George Jepsen, Connecticut's then Attorney General. The letter was written "to express . . . serious concern over reports that [DeVos's] office is preparing to roll back important protections for survivors of sexual assault on college campuses."  See Josh Shapiro, et al., Letter to Elisabeth DeVos (July 19, 2017), available at https://www.documentcloud.org/documents/3897422-Title-IX-Letter-to-Secretary-DeVos.html.

131.  The Letter began by reciting various statistics about sexual assault, all of which related to the prevalence of assault against women, specifically college women. There were no statistics or acknowledgment of men as victims of sexual assault.  Id. at 1.

132.  Despite the Attorneys Generals' letter advocating for limited due process on campuses, on September 7, 2017, DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many."  Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at:  https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

133.  DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  Id.

134. Acknowledging the massive pressure placed on universities by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." Id.

135. With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." Id. She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." Id.

136. As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter." Sarah Asch, *Federal Changes to Title IX on Sexual Assault Could Impact Middlebury*, The Middlebury Campus (Sept. 20, 2017), https://middleburycampus.com/36090/features/federal-changes-to-title-ix-on-sexual-assault-could-impact-middlebury/.

137. On September 22, 2017, the OCR formally rescinded the DCL and the 2014 Q&A and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses. See Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf;

see also Dep't of Ed., Q&A on Campus Sexual Misconduct (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

138.  In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." Id. (citations omitted) (emphasis added).

139.  In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents. Additionally, the 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches."  2017 Q&A at 4, 5.  The 2017 Q&A further directs that those issuing sanctions must consider "the impact of separating a student from her or his education," and sanctions should therefore "be proportionate to the violation."  Id. at 6.

140.  The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct."  Id. at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable [] includ[e] . . . ensur[ing] an adequate, reliable, and impartial investigation of complaints."  Id. (emphasis added). The 2017 Q&A also requires investigators to "synthesize all available evidence—including both inculpatory and exculpatory

evidence—and take into account the unique and complex circumstances of each case." Id. at 4 (emphasis added).

141.    The 2017 Q&A suggests that the policies and procedures in place at UCONN at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

142.    In November 2018, the Department of Education released proposed new Title IX regulations. See https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.

143.    The revamped regulation also explicitly noted the importance to the process that recipients use to make determinations regarding responsibility, with requirements designed to ensure that recipients make sound and supportable decisions through a process that incorporates appropriate protections for all parties while providing adequate notice of such decisions.

144.    The new regulations, CFR § 106.45(b)(4), most importantly, placed tremendous importance on schools' providing a live hearing, with both parties' present and some form of cross-examination:

> For institutions of higher education, the recipient's grievance procedure must provide for a live hearing. At the hearing, the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. . . .  At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. *If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility.*

145.    The aforementioned lead state prosecutors, including AG Jensen, largely opposed these fairness protections, and emphasis on live hearings, considering only the intrusion upon the "traumatized female victims."

146.    The Department of Education was merely advancing trends in the Courts of this country that had, for years, been questioning the fairness of unilateral decision makers, questionable adjudicative hearings, or lack thereof, and the most basic of due process protections, the right to cross-examine your accuser before a live decision maker.

147.    Indeed, one of the seminal cases in this jurisprudence came out of the Sixth Circuit which firmly established that in disciplinary cases where credibility is at issue, cross-examination is required in order to comport with due process.  See, e.g., Doe v. Baum, 903 F.3d 575, 585-586 (6th Cir. 2018). Necessary to a true right to cross-examination is that parties are required to answer questions, or at the very least, decision makers are at least willing to draw negative inferences as to credibility for anyone who refuses to answer questions.

148.    Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs, including UCONN, mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender-biased enforcement system of Title IX.

149.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, "Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct." (available at

https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct).

150.   The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," but essentially evidenced the contrary: widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

151.   In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal."   While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available."   The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

152.   On May 6, 2020, the Department of Education released the new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "**2020 Title IX Final Rule**") which carry the force and effect of law as of

August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

153. The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance, though UCONN still honors many of the most egregious, clearly biased elements of said archaic and unconstitutional rule.

154. The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding, including a neutral, unbiased live hearing, with both parties present throughout, as well as the appropriate amount of time and notice to defend against Jane Roe's dynamic allegations against him. (See "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

155. Even under application of the new Title IX regulations, Plaintiff was deprived by UCONN of numerous procedural rights as if the pre-2017 changes were still in place, as described herein.

156. UCONN's procrastination and vehement objection to the 2020 Title IX Final Rule until the last possible moment, particularly when the Department of Education has been advocating for the due process protections described therein since 2017 and releasing the rule's key protections in November 2018, demonstrated a devout adherence to the faulty statistics and gender bias inherent in the rescinded DCL.

**C. UCONN Faces Years of Internal and External Pressure to Prosecute and Punish Males Accused of Sexual Misconduct.**

157.    UCONN's use of their biased, unreliable, and fundamentally unfair adjudicatory process, here, is exacerbated by an extensive history of both internal and external pressure on UCONN to aggressively prosecute male students accused of sexual misconduct for the purpose of championing female assault survivors.

158.    For the last decade, the school has dealt with the ramifications of students, particularly female students, who did not obtain their desired satisfaction from the Title IX process. In 2014, UCONN settled a federal sexual assault lawsuit for nearly $1.3 million after five female students alleged the college was indifferent to sexual assault and violated their equal protection rights.  UCONN also publicly vowed to reform policies to better handle rape cases.   https://www.ctpost.com/local/article/UConn-settles-sex-assault-suit-for-1-3-million-5631806.php?_ga=2.80224403.522697848.1702671774-366702726.1698863620 .

159.    UCONN has often kowtowed to the student body's protests, particularly alleged 'survivor protests,' over this unjust decade, and they have been quick to make sweeping proclamations against their purported mishandling of Title IX sexual misconduct matters.  These proclamations, however, have only (and always) followed protests, and/or other negative press and pressure, from the female student body and other advocacy-minded contingents on campus.

160.    In fact, the most recent 'mea culpa,' in words, conduct, and spirit happened a mere few months before the egregious injustice John Doe was forced to suffer through in this matter.

161.    In February 2022, UCONN student, A.D., led protests on and around UCONN's campus to challenge UCONN's Title IX process, and said protests gained

significant press coverage.  A.D. complained the UCONN process was not sufficiently supportive of complainants, based primarily on the fact the respondent she accused of sexual misconduct was found not responsible.

https://www.ctinsider.com/news/article/UConn-sexual-assault-probe-sparks-student-protests-16842857.php.

162.   Around this time, the atmosphere of categorical bias against male respondents, particularly those in fraternities, across the campus was palpable, with one student commenting in a public publication: "Not ALL frat boys are rapists, BUT all frat boys stay silent to protect their 'brothers' and their frat from any consequences."

https://dailycampus.com/2022/02/09/petition-to-ban-frats-gets-more-than-1200-signatures/)

163.   UCONN'S response to these blatant calls for deprivation of due process for male respondents demonstrates its willingness to wilt to prevailing winds of external pressure. Without so much as a hint of defending their system, or suggesting the male respondents were in fact students too, who were entitled to the American Constitutional bedrock principle of a presumption of innocence, UCONN's Interim President Radenka Maric rushed to apologize for upsetting A.D. and her supporters, stating:

> "UCONN abhors sexual violence in all its forms and all it can to provide victims with compassionate care, resources, and much-needed support in the face of their trauma…We need to work together to continually shape a culture on our campuses that is rooted in respect, awareness, supporting one another, and an extreme intolerance towards any form of sexual violence."

https://www.ctinsider.com/news/article/UConn-sexual-assault-probe-sparks-student-protests-16842857.php

164.    UCONN did not waste time before acting on Interim President Maric's blatant complainant-centric interests. In a widespread communication to students on the Friday after the student protests, Maric was quick to announce the names of members of a task force to evaluate how UCONN prevents and responds to sexual violence.  The gauntlet had been dropped, and Interim President Maric allegedly received her report in May, which was no doubt used as yet another hammer with which to bang out what little rights the male respondents had left to protect themselves against obviously false claims at UCONN. See        https://www.ctinsider.com/news/article/UConn-names-members-to-task-force-combating-16939241.php.

165.    Notably, this task force was formed the semester immediately preceding the injustice suffered by John Doe.

### CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### VIOLATION OF RIGHTS UNDER TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972 (Erroneous Outcome) AGAINST DEFENDANT UCONN

166.    Plaintiff restates, realleges, and reincorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

167.    Title IX of the Education Amendments Act of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

168.    On information and belief, UCONN, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

169.    The Office of Violence Against Women, has established OVW grant programs that issue hundreds of thousands of dollars to universities specifically for beefing up their Title IX Departments, to increase the number of sexual assault reports and complaints, alone.  It is simply another form of enticement for schools to engage in the numbers game, due process and innocence be damned.

170.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant UCONN College.

171.    Title IX is enforceable through a private right of action, for monetary damages as well as injunctive relief.

172.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.  Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).

173.    The Second Circuit has observed that there are several theories available to a Plaintiff alleging gender bias in violation of Title IX.  One of those theories is known as the "erroneous outcome" theory.

174.    "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).

175.   UCONN violated Title IX in the instant case because UCONN reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

176.   The outcome was erroneous because, by way of example and not limitation:

   a. The decision was fundamentally flawed as it contained erroneous and arbitrary conclusions, not based on the evidence, and in direct conflict with credible witness testimony;

   b. The panel misstated facts, omitted facts or straight up created false non-facts to support their unsupportable findings;

   c. UCONN ignored irrefutable or undisputed evidence, ***especially that Roe's Friend was in the room and refuted Roe's false story***;

   d. The panel clearly considered, or manufactured, new evidence that did not exist;

   e. The Panel Members were riddled with bias, incompetence and complete ignorance of Doe's civil rights under Title IX and the Constitution, misapplied the preponderance standard;

   f. The Panel Members failed to decide the issues actually noticed;

   g. The Panel Members failed to reach their decision based upon all the allegations actually made by Jane Roe; and

   h. The panel members, Title IX Department and UCONN, in general, reflected an inherent bias against the male, John Doe.

177.   Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and/or the decision to impose unduly harsh discipline upon Plaintiff.  These circumstances include, by way of example and not limitation:

   a. The federal pressure placed on UCONN by law suits, OCR investigations, and the potential for hundreds of thousands of dollars in grant, which put UCONN at risk for losing federal funding, and public lawsuits in which they are issuing seven-figure checks to acknowledge their failure to protect "victims";

b. Years of pressure and criticism from the student body, including the aforementioned lawsuits and protests, to the point where the Interim President is feverishly apologizing, issuing public edicts and composing task forces, specifically geared towards UCONN's perceived failure to protect "women and girls" from sexual misconduct;

c. The very public, widespread media coverage of the above; and UCONN's clear sensitivity to such bad press, wherein it directly responds to the public pressure by revising practices, policies and procedures;

d. UCONN's continued effort to repair its tarnished reputation, particularly when it comes to allegations of sexual assault and their alleged insensitivity to "survivors";

e. UCONN's embrace of gender-normative and gender-based stereotypes, wherein it was presumed to be more reasonable that a male would commit a heinous rape than that a female would willingly engage in casual sex;

f. UCONN's blatant skewing of all facts and claims in favor of Jane Roe, despite clear evidence of her lack of credibility, specifically her friend and eyewitness;

g. UCONN's disparate treatment of similar circumstances as between Plaintiff, the male respondent, and Roe, the female complainant—deeming Doe less credible strictly based on his status as a male respondent;

h. UCONN's presumption that Roe was credible as a female complainant and Plaintiff was not credible as a male respondent, and/or its refusal to test or acknowledge the obvious problems with Roe's credibility, and her ever-changing allegations;

i. UCONN's repeated instances of deviating from proscribed rules in situations that were consistently unfavorable to John Doe and/or favorable to Jane Roe;

j. UCONN's willingness to render arbitrary conclusions that were consistently against John Doe, and arbitrarily apply principles consistently in a manner that was unfavorable to John Doe;

k. UCONN's application of standards and terms of art which are ostensibly favorable to female-complainant's even though such terms are not defined nor mentioned in UCONN's Title IX materials. This suggests that UCONN has trained panel members to evaluate evidence in a manner favorable to a female complainant.

l.  Upon information and belief, the Panel Members and the Appeal Officer harbor personal beliefs in favor of female complainants in sexual assault complaints.

m.  Upon information and belief, UCONN's training for Title IX members implicitly and/or explicitly encourages an application of the rules and procedures in favor of female complainants in sexual assault cases.

n.  Nearly all of UCONN's employees involved in John Doe's Title IX case were female, including, the director of Title IX investigations (who reviewed and authorized the initial complaint), the investigator, the hearing coordinator, the hearing chair, the assistant dean of students, the dean of students, and one of the two hearing panel members.

178.  On information and belief, UCONN's mishandling of Plaintiff's Title IX case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

179.  UCONN applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous outcome.

180.  UCONN also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor, for the same reasons as described above.

181.  Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

182.  This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career

opportunities, reputational damages, economic injuries and other direct and consequential damages.

183.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UCONN to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint and the current suspension; (iii) remove any record of the finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (vi) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### VIOLATION OF RIGHTS UNDER TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972 (Selective Enforcement) AGAINST DEFENDANT UCONN

184.    Plaintiff restates, realleges, and reincorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

185.    Per the Second Circuit another theory for alleging gender bias in violation of Title IX is known as the "Selective Enforcement" theory.

186.    A Selective Enforcement claim may "assert[] that, regardless of the student's guilt or innocence, the severity of the penalty and/or *the decision to initiate the proceeding* was affected by the student's gender." Yusuf v. Vassar Coll., 35 F.3d at 715.

187.    UCONN violated Title IX, and committed Selective Enforcement, in the instant case because UCONN's conduct in investigating Plaintiff for sexual misconduct,

and initiating multiple proceedings against him, while ignoring claims made against Roe, was affected by the students' respective genders.

188.    After her initial false allegations were lodged against Doe, as described in detail above, Roe continued to make false claims against him to Title IX personnel, namely that Doe drugged her on the night in question and, further, that he ejaculated on her without her permission.  Each time Roe uttered a complaint, all of them informal and false, Title IX initiated a formal investigation into her everchanging claims, and even formal Title IX complaints.

189.    Alternatively, Doe became fed up with Roe's consistent harassment, where she would repeatedly come to his frat house with her friends, despite the NCO in place, and try to make Doe as uncomfortable as possible by staring him down with her friends and giggling.  This harassment was a violation of UCONN's Sexual Misconduct Policy, at least two provisions, against harassment/bullying and retaliation, for Roe was clearly harassing in retaliation for his defending himself against her false claims.

190.    Doe made multiple complaints to Title IX about the repeated harassment and retaliation; he also complained that Roe was incessantly lodging false claims against him, and had evidence to support his claims, which was another clear violation of UCONN's Policy.

191.    UCONN responded immediately to Roe's informal complaints. Literally every false, nonsensical and conflicting claim Roe made, got the formal workup and investigation from Title IX. Yet Doe's legitimate claims fell on deaf ears each time.

192.    UCONN's decisions to initiate proceedings in this matter were clearly based on the University's well-worn, and pervasive gender bias.

193.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous outcome and/or the decisions to initiate proceedings against Plaintiff in the first place.  Said circumstances are outlined in detail above.

194.    On information and belief, UCONN's mishandling of Plaintiff's Title IX case, and the eagerness to initiate proceedings constantly against Plaintiff, were informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

195.    UCONN applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to Selective Enforcement against him.

196.    Had UCONN initiated formal investigations against Jane Roe for violations, as it had against John Doe, Jane Roe's credibility would have been further undermined during a hearing, and there would have been at least some pressure on Jane Roe and her advisor to play by the rules. However, as it stood, Jane Roe had nothing to lose throughout the process, which served as an invitation for her to continue making incredible claims on a whim.

197.    UCONN also imposed an erroneous outcome, as well as an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor, for the same reasons as described above.

198.    Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

199.    This unlawful discrimination, and Selective Enforcement, in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

200.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UCONN to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint and the current suspension; (iii) remove any record of the finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (vi) any and all further actions required to return Plaintiff to the status quo ante.

**AS AND FOR A THIRD CAUSE OF ACTION**
**CLAIM FOR PROSPECTIVE EQUITABLE RELIEF PURSUANT TO U.S.C. §1983 -**
**DENIAL OF FOURTEENTH AMENDMENT DUE PROCESS AGAINST DEFENDANTS**
**CAMERON LISTON AND DEFENDANT KIMBERLY BEARDSLEY-CARR IN THEIR**
**OFFICIAL CAPACITIES**

201.    Plaintiff restates, realleges, and reincorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

202.    Plaintiff asserts this claim against Title IX Coordinator Liston and Community Standards Director Carr in their official capacities.

203.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

204.    42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

205.    Public university students, including Plaintiff John Doe, have a protected property interest in their continued education, of which they cannot be deprived without due process. See, e.g., Merrow v. Goldberg, 672 F. Supp. 766, 771 (D. Vt. 1987) ("public college and university graduates have protected property interests in their degrees.").

206.    Public university students also have a protected liberty interest in their future educational and employment opportunities and occupational liberty, of which they cannot be deprived without due process.

207.    John Doe's constitutionally protected property and liberty interests in his continued enrollment at UCONN, and to be free from arbitrary suspension, also arise from the policies, courses of conduct, practices, and understandings established by UCONN.

208.    John Doe's constitutionally protected property and liberty interests similarly arise from the express and implied a contractual relationship between UCONN and John Doe.

209.    It is well established that the Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

210.    A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

211.    As a result, if John Doe as a UCONN student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that UCONN used.

212.    UCONN, as a public university established by the State of Connecticut, and the Title IX Coordinator Liston and Community Standards Director Carr, as agents of UCONN, have a duty to provide its students due process of law by and through any and all policies and procedures set forth by UCONN.

213.    Prior to his suspension, Plaintiff was a student in good standing at UCONN.

214.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

215.    Instead, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness, by applying procedures which were fundamentally unfair against John Doe, and conversely, in favor of Jane Roe.

216.    Specifically, the procedures applied deprive John Doe of: (i) an independent and, more importantly, _impartial_ adjudicative panel; (ii) a right to pursue an effective cross-examination of his accuser upon all false claims, even if UCONN unilaterally abandoned multiple claims; (iii) a live, unbiased adjudicatory hearing with full participation by Roe,

not her advisor in her stead, and neutral, unbiased panel members tasked merely with reviewing all of the evidence and determining whether the preponderance of the evidence supported the bogus claims; (iv) a presumption of innocence; (v) reasoned consideration of evidence as required by proper application of the burden of proof by the panel; (vi) adequate notice of the allegations at issue; (vii) a hearing process that requires decisions to be based upon the resolution of the issues actually noticed; and (viii) a hearing process that prohibits decision makers from deciding cases based upon evidence outside the record, misstated or inaccurate evidence, or speculative theories unsupported by the record.

217.   Further, the UCONN Police Department, an arm of UCONN, was in possession of exculpatory evidence, video surveillance which directly contradicted many of Roe's more inflammatory claims.  Doe had a reasonable expectation that his chosen university would produce evidence that refuted false rape claims against him.  Moreover, it is the investigators who bear the responsibility of collecting all relevant evidence that tends to prove or disprove claimant's claims.  Upon information and belief, the investigator either ignored her responsibility in this regard for Roe's claims or was prevented from pursuing the exculpatory video evidence.

218.   As the Supreme Court has set forth:

identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

219.   In the instant case, Plaintiff has a significant private interest in ensuring that he is not falsely adjudicated as a rapist.  Not only does the University's decision, and the unconstitutional suspension, have a considerable impact on his ability to continue his education at UCONN and graduate on time, but it will also have life-long and far-reaching consequences.  By way of example, and not limitation, virtually any graduate school or other institution of higher education, or future professional or governmental licensing application, to which Plaintiff would apply for admission and/or certification or licensing, will Plaintiff to disclose that was found responsible for Sexual Assault and suspended as a result.  Needless to say, employers and schools are not eager to admit those who are perceived as "sex offenders."  In addition, Plaintiff's suspension may set back his graduation date, causing any future employer or educator who reviews his resume to speculate as to why Plaintiff did not complete his degree in four years, as planned.

220.   The probable value of additional procedural safeguards—to wit, appropriate notice of the issues to be decided, resolution of all issues noticed, a fair and thorough and impartial investigation that seeks all relevant evidence without consideration for which party the relevant evidence supports; *neutral* adjudicators, a live-hearing which requires the parties to be present or otherwise not particpate, the ability to effectively cross-examine one's accuser on all manner of credibility concerns, including additional claims made after the initial Title IX complaint, and procedures requiring that decisions be based upon actual evidence —is extremely high, as it will lead to more accurate, reliable and more just outcomes, which will overall provide for a safer campus while avoiding the improper separation of an innocent student from his education.

221.   Finally, the State's interest in withholding such procedural safeguards is extremely weak.  First, there is no legitimate justification for not requiring adjudicators to base their decisions on evidence actually put before it, training them to consider the evidence in a neutral manner, inquiring into an adjudicator's experience or pre-held biases concerning the subject matter, disclosing an adjudicator's prior relevant experiences and involvement relevant to the subject matter, requiring parties to be present at a hearing, requiring parties to answer questions or else allowing adjudicators to draw an adverse inference from the refusal to answer, or requiring to consistently apply principals of evidentiary evaluation equally to both partis.

222.   Second, applying fair procedures and training investigators and adjudicators to be impartial would not overburden an institution like UCONN especially when considering that cases like this one deal with accusations of sexual assault, which can, and did, result in separation from the University.  On information and belief, the number of such cases that are processed through UCONN's Title IX Department each year was extremely low, as cited often by the protesters.  Moreover, UCONN already has several employees it claims to be trained in Title IX processes. Thus, UCONN would not need to do anything additional, it would simply require UCONN to administer to modify their policies to ensure impartiality and adapt the already existing training to ensure that policies are impartially applied.

223.   Third, requiring staff to review and reverse decisions which were not rendered in accordance with impartial policies or principals would not add any burden upon UCONN as it already has a procedure in place for reviewing such issues, and people

charged with the duty to ensure fairness like Title IX Coordinator Liston and Community Standards Director Carr.

224.    John Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations, in this case, resulted in a sanction that will have lifelong ramifications for John Doe.

225.    Title IX Coordinator Liston and Community Standards Director Carr were responsible for ensuring that John Doe received due process throughout the Title IX disciplinary process. However, Title IX Coordinator Liston and Community Standards Director Carr failed to ensure due process for John Doe by allowing the violations set forth above, and by failing to take reasonable steps to rectify the violations after they occurred.

226.    Upon information and belief, in order to rectify the damage created by the erroneous decisions by the Panel Members and Appeal Officer Clokey, Title IX Coordinator Liston and/or Community Standards Director Carr have the power and authority to expunge, vacate, correct, and/or modify the Hearing Panel and Appeal decision, and/or otherwise expunge John Doe's disciplinary record. However, to date, both Defendants have refused to do so, and have otherwise taken no action to remediate the harm caused by the violations of John Doe's due process rights.

227.    As a direct and proximate result of the above conduct, Plaintiff's life has been, and will continue to be, permanently altered negatively due to the stain of the permanent record created by the Panel Members' and Appeal Officer Clokey's decisions

228.   Accordingly, Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment.

229.   As a result of the foregoing, Plaintiff respectfully requests all equitable relief the Court reasonably deems necessary to remediate the harm caused by the violations against John Doe and return Plaintiff to the status *quo ante*, including an order requiring Title IX Coordinator Liston and/or Community Standards Director Carr to: (i) vacate the suspension of John Doe from UCONN, (ii) vacate or reverse the outcome, findings, and sanction regarding Jane Roe's complaint, (iii) expunge Doe's transcript and entire college record (including his disciplinary record) of any reference to his wrongful sanctions and finding of his violation of sexual misconduct, (iv)  issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed, and (v) issue a letter of good standing so that John Doe can transfer to another university should he desire.

230.   John Doe further requests attorney's fees and costs as authorized by law.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**CLAIM FOR DAMAGES PURSUANT TO U.S.C. §1983 - DENIAL OF FOURTEENTH AMENDMENT DUE PROCESS AGAINST DEFENDANTS JOSEPH REVANDER, JENNIFER NAPIORSKI, AND DAVID CLOKEY**

231.   Plaintiff restates, realleges, and reincorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

232.   Plaintiff asserts this claim against Panel Member Revander, Panel Member Napiorski, and Appeal Officer Clokey in their individual capacities.

233.   As more fully stated above, due process requires, at a minimum:

      a.   an adjudication by neutral decision makers who are not predisposed to be personally biased in favor of party to a dispute,

b.  an equal application of decision-making principles to both parties,

c.  a proper application of the burden of proof,

d.  decisions based upon the evidence actually presented during the hearing,

e.  decisions based upon the actual rules governing the disciplinary proceeding at issue,

f.  panel members who refrain from basing a decision on facts and evidence not in the record,

g.  panel members who refrain from creating new evidence that does not exist,

h.  panel members who decide the issues actually noticed,

i.  decisions containing non-arbitrary conclusions,

j.  panel members and appeal officers who consider evidence that contradicts their conclusions and who otherwise explain why they are reaching a conclusion despite the clearly contradictory evidence,

k.  panel members who do not arbitrarily apply evidentiary principles that are outside of the established policies which are favorable only to one party in a dispute,

l.  panel members and appeal officers who do not ignore undisputed or unrefuted evidence,

m.  appeal officers who do not misstate or mischaracterize the record upon which they base their decision, and

n.  appeal officers who provide rational explanations for their decisions which are based upon the actual facts and the rules which govern the proceedings at issue.

234.   As set forth in detail in this Complaint, in the course of carrying out their duties in this case, Panel Member Revander, Panel Member Napiorski, and Appeal Officer Clokey each failed to provide a fair process to John Doe by failing in each regard listed the preceding paragraph and its subparts, as well as, throughout this Complaint.

235.    In the course of carrying out their duties in this case, Panel Member Revander, Panel Member Napiorski, and Appeal Officer Clokey were acting under the color of state law.

236.    Upon information and belief, Panel Member Revander, Panel Member Napiorski, and Appeal Officer Clokey were predisposed by their experience, training, and/or personal beliefs to be biased against male respondents like John Doe in cases alleging sexual assault.

237.    Given the foregoing, it would be clear to a reasonable person in the shoes of the Panel Members and Appeal Officer Clokey that failing to ensure a fair process in the manner done so in this case would clearly violate the rights of a student like John Doe.

238.    As a direct and proximate result of the deprivation of due process by the Panel Members and Appeal Officer Clokey, John Doe sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

239.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **REQUEST FOR JURY TRIAL**

240.    In accordance with Fed. R. Civ. P. 38, Doe requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

241.    A suspension will cause irreparable harm to Doe's career, educational opportunities, and goals. A suspension would harm his reputation and cause emotional harm. No legal remedy exists for these injuries.

242.    Doe is suffering ongoing actual damages from being the subject of a disciplinary action that is being undertaken pursuant UCONN's sexual misconduct rules, all in violation of Title IX.

WHEREFORE, Doe prays that the Court grant the following relief:

a)  Declare Defendant liable for breach of contract;

b)  Declare Defendant in violation of Title IX;

c)  Enter an order restraining Defendants from enforcing the suspension of Doe from UCONN.

d)  Order UCONN to expunge Doe's transcript and college record of any reference to his wrongful sanctions and finding of his violation of sexual misconduct;

e)  Order UCONN to issue a letter of good standing so that he can transfer to another university should he desire;

f)  Order UCONN to institute policies guaranteeing fair and equitable processes for accused students;

g)  Order UCONN to pay all direct and indirect damages suffered by Doe;

h)  Order Defendant to pay Doe's reasonable attorney's fees and costs; and

i)  Order such additional legal or equitable relief as the Court finds just and improper.

Dated: March 19, 2024

Respectfully submitted,

THE PLAINTIFF,

JOHN DOE

By _____
Ryan O'Neill, Esq. (ct28345)
**LAW OFFICES OF MARK SHERMAN, LLC**
29 Fifth Street
Stamford, CT 06905
Tel: (203) 358-4700
Fax: (203) 325-9478
ryan@markshermanlaw.com